## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CRIMINAL ACTION FILE** |
| | **NO. 1:22-CR-00107-MHC-JEM-5** |
| **DERRICK VAUGHN, a/k/a TEVON BROWN, a/k/a DARRICK VAUGHN, JR.,** | |
| **Defendant.** | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

Pending before the Court is Defendant's motion to suppress statements. (Doc. 120). For the below reasons, the Court **RECOMMENDS** that the motion be **DENIED**.

## I.   BACKGROUND

The seven-count indictment, which was returned by a federal grand jury sitting in the Northern District of Georgia on April 5, 2022, charges five defendants with firearm-related offenses. (Doc. 45.) As relevant here, the indictment charges Defendant in count one with conspiracy to commit violations of 18 U.S.C. §§ 922(a)(6) (providing false information to a federally licensed firearms dealer) and 922(a)(5) (providing firearms to non-state residents), in violation of 18 U.S.C. § 371; in count two with providing false information to a federally licensed firearms dealer, in violation 18 U.S.C. §§ 922(a)(6), 924(a)(2),

and 2; in count three with providing firearms to non-state residents, in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1), and 2; and in count seven with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*Id.*)

On November 17, 2022, Defendant filed the pending motion to suppress statements, in which he asserted that statements he made to law enforcement agents on March 7, 2022, were obtained in violation of *Miranda*. (Doc. 120); *see Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that certain specific warnings must be given in order for a defendant's statement(s) made during custodial interrogation to be admitted into evidence). The Court held an evidentiary hearing on Defendant's motion on January 4, 2023,[1] (Docs. 126; 131), and having now received the parties' post-hearing briefs, (Docs. 136; 141; 142), the matter is ripe for review.

## II.   STATEMENT OF FACTS

### A. Law Enforcement Testimony

During the course of a firearms trafficking investigation, ATF agents learned that Defendant was involved in illegal firearms trafficking, and also that Defendant was a convicted felon. (Doc. 135 at 7-10, 13-14, 22, 50-51);[2] *see also*

---

[1] Due process requires that a trial court hold what is now known as a "*Jackson-Denno* hearing" when a defendant contests the voluntariness of his statement. *Miller v. Dugger*, 838 F.2d 1530, 1535-36 (11th Cir. 1988); *see also Jackson v. Denno*, 378 U.S. 368 (1964) (holding that when a defendant objects to the introduction of his statements as coerced or involuntary, a trial court must make an independent determination that the statement is voluntary before permitting it to be heard by a jury).

[2] Transcript cites refer to the Court's ECF page numbering.

*https://www.atf.gov* (ATF is the acronym for the Bureau of Alcohol, Tobacco, Firearms and Explosives, which is a federal law enforcement agency). On March 7, 2022, as part of the investigation, agents were following a vehicle in which Defendant was a backseat passenger, and when the vehicle pulled into a parking space at an apartment complex in Forest Park, Georgia, the agents conducted a stop of the car. (Doc. 131 at 8-10.) ATF Special Agent (SA) Nathan Bray estimated that there were between four and six agents involved with the stop, and ATF SA Jonah James estimated that there were between six and eight agents involved. (*Id.* at 46.) The agents first "secured the scene" by directing everyone, including Defendant, to get out of the vehicle and stand in a nearby grassy area. (*Id.* at 8-10, 18-19, 34). SA Bray stood with the vehicle's occupants, including Defendant, for about 15-25 minutes providing "scene security," while other agents searched the vehicle and spoke on the phone with federal prosecutors regarding possible charges. (*Id.* at 18-21, 26, 46, 58-59.) SA Bray and SA James were both dressed in plain clothes, but they had vests that said "Police" across the front, and their badges were prominently displayed. (*Id.* at 16-17, 26-27, 47.) At the time of the stop, the blue lights on the law enforcement cars were activated. (*Id.* at 28.) It was a windy, rainy day, but according to SA Bray, the temperature was "mild." (*Id.* at 23, 25, 27, 46-48, 58.)

SA Bray initially had his firearm drawn, but once Defendant was out of the vehicle, his firearm was secured in the holster on his right hip. (*Id.* at 17, 27-29.) SA Bray considered Defendant to be "in custody" at the point when he was standing in the grass with Defendant given that the agents knew Defendant was

a convicted felon in possession of a firearm and he was not free to leave, but SA Bray could not definitively recall if Defendant was handcuffed then. (*Id.* at 19-20, 22). When the decision was made to arrest Defendant, however, Defendant was secured in handcuffs, and SA Bray read him the *Miranda* warnings from the "ATF Advice of Rights Waiver" form. (*Id.* at 11-14, 20-25; Gov't Ex. 1 (audio) at 01:00–02:16.)[3] SA Gary Dorman was also present with SA Bray and Defendant at that time, and SA Bray testified that he did not recall SA Dorman having his weapon drawn. (Doc. 131 at 11-12, 14, 34.) After SA Bray read the *Miranda* warnings to Defendant, he asked Defendant if he understood. (*Id.* at 29; Gov't Ex. 1 (audio) at 01:00–01:58.) According to SA Bray, Defendant nodded his head, but as heard on the recording, when SA Bray told Defendant that he needed to say yes or no, Defendant said "yes, sir." (Doc. 131 at 29-30; Gov't Ex. 1 (audio) at 01:59–02:01). SA Bray then asked if Defendant wished to speak to him, and Defendant said "I don't know what's going on," at which point SA Bray explained that they "could talk," but Defendant could stop questioning at any time. (Doc. 131 at 29-30; Gov't Ex. 1 (audio) at 02:03–02:09.) He asked if Defendant understood that, and Defendant responded "yeah." (Gov't Ex. 1 (audio) at 02:09–02:11.) SA Bray then asked again if Defendant understood his

---

[3] Government's Exhibit 1, which was admitted into evidence at the hearing, is a DVD that contains two recordings—an audio only recording of SA Bray's interaction with Defendant at the roadside vehicle stop; and a video and audio recording of Defendant's interview at the police station. (Docs. 128; 131 at 11-13, 32, 39-40, 44-45; Gov't Ex. 1.) The Court will refer to these as "Gov't Ex. 1 (audio)" and "Gov't Ex. 1 (video)."

rights, and Defendant responded "yeah." (Gov't Ex. 1 (audio) at 02:11–02:13.) SA Bray asked again if Defendant wished to speak to him, and Defendant responded "yeah." (Gov't Ex. 1 (audio) at 02:13–02:16.) At that point, SA Bray stated that he was going to move Defendant's handcuffs "in front," so that Defendant's hands were cuffed in front of his body instead of behind his back. (Gov't Ex. 1 (audio) at 02:27–02:30.)

SA Bray testified that Defendant did not appear to be under the influence of any drugs or alcohol, or otherwise impaired in any way. (Doc. 131 at 13-14, 31-35). SA Bray did not threaten Defendant or promise him anything, nor was he aware of anyone else making any threats or promises to Defendant. (*Id.* at 13-14). According to SA Bray, Defendant understood SA Bray's questions as was shown by the fact that, throughout their interaction, Defendant always responded appropriately. (*Id.* at 13-15.) SA Bray was aware at the time of the stop that Defendant was a convicted felon, but he later learned that Defendant has multiple prior felony convictions. (*Id.* at 14, 22.) SA Bray also later learned that Defendant has a sixth grade level of education, but he did not know Defendant's education level on March 7, 2022. (*Id.* at 14, 33.)

During SA Bray's entire interaction with Defendant, they were outside; Defendant was not in a patrol car. (*Id.* at 34, 58-59.) SA Bray's roadside interview lasted about two minutes after *Miranda* warnings were given and Defendant agreed to speak with him, (Gov't Ex. 1 (audio) at 03:00–05:12), and at that point, SA Dorman stated that they were going to the precinct and they would "finish talking to [Defendant]" there. (Doc. 131 at 15-16; Gov't Ex. 1 (audio) at 05:12–

05:30.) Defendant was then transported to the Forest Park Police Department, in Forest Park, Georgia. (Doc. 131 at 16, 37.) SA James testified that the reason for transporting Defendant and the other individuals in custody to the police department at that point was to get everyone out of the rain, though several agents stayed at the scene, working with evidence. (*Id.* at 49-50, 58.)

Defendant and co-defendant, Purcell Lipscomb, waited together in an interview room at the police station for approximately one hour, during which time Defendant stated, "Bro, I ain't talking." (Gov't Ex. 1 (video) at 0:48:20–0:48:30; Doc. 45.) The recording shows that Defendant and Lipscomb were talking to each other, Defendant was facing Lipscomb, and he made the statement to Lipscomb. (Gov't Ex. 1 (video) at 0:47:00–0:48:30.) There was an unidentified police officer standing near the open doorway, but Defendant was not facing him, and his statement was not directed to the officer. (*Id.*)

SA James and SA Dorman interviewed Defendant at the Forest Park Police Department in a closed room that contained a table and a few chairs. (Doc. 131 at 35-40, 48-49, 58; Gov't Ex. 1 (video) at 0:54:35–1:24:45.) SA James testified that Defendant was definitely in custody, though he was uncertain what decisions had been made about arrest or charges at that point. (Doc. 131 at 38, 40-41, 44.) SA James could not recall if he was wearing his firearm, or if he had been required to lock it up as some police departments require, but he testified that if he had it on him, it was covered and not visible. (*Id.* at 41.) According to SA James, the interview began between 5:30–6:00 p.m., and it lasted for about 30-35 minutes. (*Id.* at 40-42, 44, 58; Govt' Ex. 1 (video) at 0:54:35–1:24:45.) SA James

knew that Defendant had been given *Miranda* warnings at the roadside location, but he gave Defendant *Miranda* warnings again "to make sure that [Defendant] understood his rights," and to "remind him of his right to stop talking or not answer any more questions." (Doc. 131 at 42, 53-56; Gov't Ex. 1 (video) at 0:54:35–0:55:49.)

As shown in the recording, both SA James and SA Dorman identified themselves to Defendant, and their weapons, if they were wearing them, were not drawn or visible. (Gov't Ex. 1 (video) at 0:54:35–0:54:55.) SA James first explained to Defendant that he would read Defendant his rights before they start talking, and that SA James's goal in talking to Defendant was to find out what Defendant could help them understand about "what was going on." (Gov't Ex. 1 (video) at 0:54:55–0:55:49.) SA James further explained that Defendant had no obligation to speak with them, stating that "at the end of the day, you were a convicted felon, you had a firearm in the car," and they could walk away and "let it be what it is, but there's also some room here for you to talk about what's going on and that will be looked upon favorably whenever we present this for charges." (*Id.*) SA James stated that "I want to have a conversation with you, but if you don't want to it's fine, it's business, I get it." (*Id.*) SA James then read the *Miranda* warnings to Defendant from the ATF waiver form. (Doc. 131 at 53; Gov't Ex. 1 (video) at 0:55:50–0:56:33.) When SA James asked Defendant if he understood his rights and wanted to speak with them, Defendant nodded his head, and he said, "I just want to know why we're here," at which point SA James started talking to him about why he was there. (Doc. 131 at 42-43, 58; Gov't

Ex. 1 (video) at 0:56:33–056:55.) SA James did not ask Defendant to sign the waiver form. (Doc. 131 at 53-57; Gov't Ex. 1 (video) at 0:55:50–0:56:55.)

SA James testified that, during the interview, he asked Defendant questions, Defendant responded to the questions, and Defendant also asked questions, but Defendant never indicated that he had changed his mind, or that he no longer wanted to speak with the agents, nor did he ever ask for an attorney. (Doc. 131 at 43-44; Gov't Ex. 1 (video) at 0:56:55–1:24:45.) SA James further testified that neither he, nor SA Dorman, threatened Defendant or promised him anything, and they did not force him in any way to answer questions. (Doc. 131 at 44; Gov't Ex. 1 (video) at 0:54:35–1:24:45.) According to SA James, Defendant did not appear to be under the influence of any drugs or alcohol, or impaired in any way, and his responses to all of SA James's questions were timely, coherent, and appropriately addressed the questions. (Doc. 131 at 43, 48, 50-53, 57-58; Gov't Ex. 1 (video) at 0:54:35–1:24:45.)

## B. Defendant's Testimony

Defendant testified that he has a fifth grade education. (Doc. 131 at 67.) According to Defendant, he can read "a little bit," and he can write his name, but in order to write anything other than his name, he "would have to see it," and he "would be able to copy it." (*Id.*)

Defendant testified that on March 7, 2022, the weather was "raining and windy;" he did not have a raincoat; he was standing in the rain with four other people for "a few hours," meaning "more than two hours;" and while he was standing in the rain, he was handcuffed, with the cuffs positioned behind his

body. (*Id.* at 68-70, 75-76.) Defendant also testified that he was in custody "for a while," or "about an hour," at the roadside location before the *Miranda* warnings were read to him, (*Id.* at 68-69), and that he was at the roadside location from "daytime" until dark, (*Id.* at 75-76). According to Defendant, he had listened to the audio recording of his roadside interview, and he agreed that the interview lasted about five minutes, and that *Miranda* warnings were read to him. (*Id.* at 71-73) ("Yeah, he read it.") Defendant testified that he did not recall where he was when he was interviewed at the roadside location, but then he also testified that he was standing in the rain. (*Id.* at 76-77.)

According to Defendant, he sat in the interview room at the police station for "about two hours," and when asked if other people were in the interview room with him "at any point," Defendant testified that Lipscomb was in the room. (*Id.* at 69.) Defendant further testified that, although he remembered going to the police station, and sitting in the interview room, he did not remember "talking to nobody" at the station, including Lipscomb, SA James and SA Dorman. (*Id.* at 72-75.)

## III.   <u>DISCUSSION</u>

A defendant's uncounseled, custodial statement(s) are inadmissible unless the government shows by a preponderance of the evidence that the defendant was warned of his right to counsel and his privilege against self-incrimination, and he made a voluntary and knowing waiver of those rights.[4] *See Miranda,* 384

---

[4] Here, it is undisputed that Defendant was in custody for both the roadside interview and the police station interview, and that *Miranda* warnings

U.S. at 475; *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991); *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983); *see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (reaffirming that the government must prove *Miranda* waiver only by a preponderance of the evidence). Establishing the validity of a *Miranda* waiver requires a two-part showing. First, the government must show that the waiver was voluntary—the product of a free and deliberate choice rather than a result of intimidation, coercion, or deception; and second, the government must show that the waiver was knowing—made with the awareness of both the right being abandoned and the consequences of the decision to abandon the right. *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010); *Beale*, 921 F.2d at 1434-35. "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).

"[C]ourts can infer a waiver of *Miranda* rights from the actions and words of the person interrogated." *Thompkins*, 560 U.S. at 387 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). That is, valid waivers can be established even absent formal or express statements of waiver. *Id.* at 383. An "implicit waiver" of the "right to remain silent" is sufficient, and "may be implied through the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Id.* at 384 (citing *Butler*, 441 U.S. at 373) (internal

_____

were read to him before each interview. (Docs. 131 at 19-30, 35-49, 58; 136; 141; 142; Gov't Ex. 1 (audio); Gov't Ex. 1 (video).)

quotations omitted)). "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Id.* at 387. "Thus, after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights." *Id.* at 388. "Any waiver, express or implied, may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Id.* at 387. But importantly, a defendant must invoke his right to remain silent, or his right to counsel, "unambiguously." *Id.* at 381. "If an accused makes a statement concerning the right to counsel [or right to remain silent] that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Id.* at 381 (finding "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*") (citing *Davis v. United States*, 512 U.S. 452, 459 (1994) (internal citations and quotations omitted)).

Here, the totality of the circumstances establish that Defendant made a voluntary and knowing *Miranda* waiver, and he did not invoke his right to remain silent. His statements should, therefore, be ruled admissible. The Court will discuss each element in turn.

### A. Defendant waived his *Miranda* rights both "explicitly" and "implicitly."

It is undisputed that the *Miranda* warnings were read to Defendant twice. (Docs. 131 at 19-30, 35-49, 58; 136; 141; 142; Gov't Ex. 1 (audio); Gov't Ex. 1 (video).) At the roadside interview, SA Bray read the *Miranda* warnings to Defendant from the "ATF Advice of Rights Waiver" form, and after reading the warnings, he asked Defendant if he understood. (Doc. 131 at 11-14, 20-25, 29; Gov't Ex. 1 (audio) at 01:00–02:16; *see also* Doc. 131 at 71-73 (Defendant: "Yeah, he read it").) Defendant nodded his head, but as heard on the recording, when SA Bray told Defendant that he needed to say yes or no, Defendant said "yes, sir." (Doc. 131 at 29-30; Gov't Ex. 1 (audio) at 01:59–02:01). SA Bray then asked if Defendant wished to speak to him, and Defendant said, "I don't know what's going on," at which point SA Bray explained that they "could talk," but Defendant could stop questioning at any time. (Doc. 131 at 29-30; Gov't Ex. 1 (audio) at 02:03–02:09.) He asked if Defendant understood that, and Defendant responded "yeah." (Gov't Ex. 1 (audio) at 02:09–02:11.) SA Bray then asked again if Defendant understood his rights, and Defendant responded "yeah." (Gov't Ex. 1 (audio) at 02:11–02:13.) SA Bray asked again if Defendant wished to speak to him, and Defendant responded "yeah." (Gov't Ex. 1 (audio) at 02:13–02:16.) Thus, at the roadside location, Defendant "explicitly" waived his *Miranda* rights.

At the police station, although the *Miranda* warnings had been given to Defendant at the roadside location, SA James gave Defendant the *Miranda* warnings again. (Doc. 131 at 42, 53-56; Gov't Ex. 1 (video) at 0:54:35–0:55:49.) SA James was not required to do so, as there is no requirement that a suspect be

continually reminded of his *Miranda* rights once he has waived them. *See Ballard v. Johnson*, 821 F.2d 568, 571–72 (11th Cir. 1987) (discussing Court's prior holding that a suspect who was fully advised of and waived his *Miranda* rights did not need to be given *Miranda* warnings again prior to a subsequent interrogation conducted seven days later; and finding in the instant case, that *Miranda* warnings were not required a second time when defendant's interrogation occurred on the same day and the only break in his questioning came as a result of transporting him from the police station to the sheriff's department); *United States v. Canseco*, 465 F.2d 383, 386 (5th Cir. 1972) (holding that "[t]he efficacy of the initial [*Miranda*] warning was in no way diluted in the short period of time which elapsed between the warning, the arrest, and the statements made by appellant"); *United States v. Sells*, No. 21-10208, 2021 WL 6061772, at *3 (11th Cir. Dec. 20, 2021) (holding that re-administration of *Miranda* warnings was not required because the 40 minutes between the interview with Sgt. Gomien and the interview with Detective Sheffield was significantly shorter than the time periods of up to seven or twelve days that the Court has upheld as not requiring new or reiterated *Miranda* warnings).

But in any event, at the police station, as shown in the recording, SA James first explained to Defendant that he would read Defendant his rights before they started talking, and that SA James's goal in talking to Defendant was to find out what Defendant could help them understand about "what was going on." (Gov't Ex. 1 (video) at 0:54:55–0:55:49.) SA James further explained that Defendant had no obligation to speak with them, stating that, "at the end of the day, you were a

convicted felon, you had a firearm in the car," and they could walk away and "let it be what it is, but there's also some room here for you to talk about what's going on and that will be looked upon favorably whenever we present this for charges." (Gov't Ex. 1 (video) at 0:54:55–0:55:49.) SA James stated that "I want to have a conversation with you, but if you don't want to it's fine, it's business, I get it." (Gov't Ex. 1 (video) at 0:54:55–0:55:49.) SA James then read the *Miranda* warnings to Defendant from the ATF waiver form. (Doc. 131 at 53; Gov't Ex. 1 (video) at 0:55:50–0:56:33). When SA James asked Defendant if he understood his rights and wanted to speak with them, Defendant nodded his head, and he said, "I just want to know why we're here," at which point SA James started talking to him about why he was there, and the interview proceeded. (Doc. 131 at 42-43, 58; Gov't Ex. 1 (video) at 0:56:33–056:55.)

Although Defendant's second waiver at the police station was not "explicit," as it was at the roadside, his actions in answering questions, and also asking questions, show that he also made an "implicit" waiver at the police station. *See United States v. Boon San Chong*, 829 F.2d 1572, 1574-75 (11th Cir. 1987) (finding that defendant's election to answer questions shortly after being advised of his rights in English and Chinese indicated that he was knowingly waiving his rights); *see also Thompkins*, 560 U.S. at 384 (holding that an "implicit waiver" of defendant's "right to remain silent" is sufficient to admit his statement into evidence).

### B.  Defendant did not invoke his right to remain silent.

As discussed, a defendant must invoke his right to remain silent, or his right to counsel, "unambiguously," and he also must do so during custodial interrogation. *Thompkins*, 560 U.S. at 381; *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (*Miranda* rights attach "when custodial interrogation begins"); *United States v. Grimes*, 142 F.3d 1342, 1348-49 (11th Cir. 1998) (applying *Miranda* only if defendant was both in custody and being interrogated at the time the statements were made). If Defendant makes an ambiguous or equivocal statement, or makes no statement, "the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Thompkins*, 560 U.S. at 381 (internal citations and quotations omitted) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). "An unequivocal and unambiguous invocation of the right to remain silent is one articulated 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request' to exercise his right to remain silent and terminate the interrogation, not that it *might* be a request to remain silent." *Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1194 (11th Cir. 2012) (emphasis in original) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). Further, a defendant's "refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent," and "questioning may continue until the [defendant] articulates in some manner that he wishes the questioning to cease." *United States v. Mikell*, 102 F.3d 470, 477 (11th Cir. 1996).

Defendant argues that he invoked his right to remain silent by unequivocally stating "Bro, I ain't talking," to an unidentified Forest Park Police Officer while he was waiting in the interview room at the police station, and based on that statement, no further questioning should have occurred. (Doc. 136 at 36-37). Defendant's argument is unsupported by the evidence. The referenced statement, "Bro, I ain't talking," was made during the time that Defendant and Lipscomb were waiting together for approximately one hour in the interview room. (Gov't Ex. 1 (video) at 0:48:20–0:48:30.) The recording shows that Defendant and Lipscomb had been talking to each other, Defendant was facing Lipscomb, and he made the statement to Lipscomb. (*Id.* at 0:47:00–0:48:30). There was an unidentified police officer standing near the open doorway, but Defendant was not facing him, and his statement was not directed to the officer. (*Id.*) When SA James and SA Dorman arrived to interview Defendant, and Lipscomb was moved to another location, SA James expressly informed Defendant that he had no obligation to speak with the agents, and if he didn't want to "it's fine." (Gov't Ex. 1 (video) at 0:48:25–0:56:33.) After SA James then read the *Miranda* warnings to Defendant from the ATF waiver form, he asked Defendant if he understood his rights and wanted to speak with them, at which point Defendant nodded his head and said, "I just want to know why we're here," and the interview proceeded. (Doc. 131 at 42-43, 53, 58; Gov't Ex. 1 (video) at 0:55:50–056:55.) SA James testified that, during the interview, he asked Defendant questions, Defendant responded to the questions, and Defendant also asked questions, but Defendant never indicated that he had changed his mind, or

that he no longer wanted to speak with the agents, nor did he ever ask for an attorney. (Doc. 131 at 43-44, 48, 50-53, 57-58.) This testimony is corroborated by the recording. (Gov't Ex. 1 (video) at 0:54:35–1:24:45.) Defendant had the opportunity, after SA James read the *Miranda* warnings and prior to answering questions, to "unambiguously" state that he did not wish to speak to the agents, but he did not do so. (Doc. 131 at 42, 53-56; Gov't Ex. 1 (video) at 0:54:35–0:55:49.) Instead, he proceeded with the interview. (Doc. 131 at 42-43, 53, 58; Gov't Ex. 1 (video) at 0:55:50–1:24:45.) Defendant's actions indicate that, once he was outside of his co-defendant's presence, he did not wish to remain silent.

Even assuming that Defendant's statement to Lipscomb was an attempt to invoke his right to remain silent, which the evidence does not support and the Court does not find, it is undisputed that this statement was made before Lipscomb left the room, and before SA James and SA Dorman arrived. (Doc. 136 at 21, 36-37; Gov't Ex. 1 (video) at 0:48:25–0:56:33.) Defendant was in custody, but he was not being interrogated. (Doc. 136 at 21, 36-37; Gov't Ex. 1 (video) at 0:48:25–0:56:33.) Thus, the statement was ineffective as an invocation because *Miranda* rights cannot be anticipatorily invoked. *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (noting that "[m]ost rights must be asserted when the government seeks to take the action they protect against," and accordingly, *Miranda* rights cannot be invoked anticipatorily); *Grimes*, 142 F.3d at 1348 (same); *Pardon v. Sec'y, Fla. Dep't of Corr.*, 607 F. App'x 908, 912 (11th Cir. 2015) (finding that petitioner's interrogation did not violate *Miranda* because, although

17

petitioner was in custody when he asked about an attorney, he was not undergoing or imminently subject to interrogation).

### C. Defendant's *Miranda* Waiver was Voluntary

"Police coercion is a necessary component to finding that a defendant 'involuntarily' waived [his] right to remain silent." *United States v. Ouedraogo*, 824 F. App'x 714, 722 (11th Cir. 2020) (citing *Connelly*, 479 U.S. at 167 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'")); *see also Barbour*, 70 F.3d at 585 (explaining that for a *Miranda* waiver to be found involuntary, "there must be coercion by an official actor"); *Atkins v. Singletary*, 965 F.2d 952, 959 (11th Cir. 1992) (explaining that defendant's confession was constitutionally voluntary because the record showed no improper or coercive tactics by police or other state actors). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (citations omitted).

The evidence here shows no police coercion, deception or intimidation. First, Defendant argues that the agents should have asked Defendant to sign a written waiver because it would serve as "strong evidence" of the waiver's existence, but as he concedes, the law does not require it. (Doc. 131 at 32). Failure to obtain a signed *Miranda* waiver is not proof that a defendant did not freely and intelligently waive his rights. *United States v. Bernal-Benitez*, 594 F.3d 1303,

18

1319 (11th Cir. 2010); *United States v. Patman*, 557 F.2d 1181, 1182 (5th Cir. 1977)[5] (finding defendant's confession admissible despite his refusal to sign a waiver because the "defendant stated that he was willing to answer questions and that he understood his rights," and there was no "contrary evidence" to show the confession was involuntary); *Boon San Chong*, 829 F.2d at 1574 (explaining that a waiver of rights can be implied from the actions and words of the person being questioned, and that "Courts have for some time rejected the argument that a refusal to sign a waiver form automatically renders subsequent questioning improper").

Second, "the use of handcuffs does not establish coercion." *Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) (affirming district court's decision that defendant's statements were not coerced or involuntary as a result of questioning that lasted five hours while defendant was in a small room and remained handcuffed); *United States v. Ogden*, 572 F.2d 501, 502 (5th Cir. 1978) (holding that "[t]he fact that defendant was wearing handcuffs does not indicate or even suggest that he was coerced"); *United States v. Crawford*, No. 1:18-CR-318-MLB-JKL-2, 2019 WL 7559737, at *4 (N.D. Ga. Sept. 24, 2019), report and recommendation adopted, No. 1:18-CR-00318, 2019 WL 5800271 (N.D. Ga. Nov. 7, 2019) (finding that "[b]eing handcuffed behind the back and restrained by a

---

[5] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit that were issued before October 1, 1981.

seatbelt falls fall short of the type of physical duress that would make the environment so coercive that it overbore [defendant's] free will").

Third, contrary to Defendant's argument that the agents promised "leniency" to Defendant, (Doc. 136 at 41, 48), the evidence shows only that the agents informed Defendant that choosing to cooperate would be looked upon favorably when deciding what charges would be brought, which was not a false statement. (Gov't Ex. 1 (video) at 0:54:55–0:55:49; Gov't Ex. 1 (audio) at 03:00–05:12.) The agents never told Defendant that he would not be charged if he agreed to speak to them, nor did they make any other deceptive or untrue statements or promises. (Doc. 131 at 13-14, 44; Gov't Ex. 1 (video) at 0:54:35–1:24:45; Gov't Ex. 1 (audio) at 1:00–05:30); *see also United States v. Johnson*, 379 F. App'x 964, 968 (11th Cir. 2010) (explaining that agent's statement that defendant's sister-in-law might be arrested for the cocaine was not deceptive or threatening, it was a statement of a realistic possibility); *United States v. Nash*, 910 F.2d 749, 752–53 (11th Cir.1990) (explaining that discussions of realistic penalties for failing to cooperate are generally insufficient to preclude free choice).

Fourth, the presence of four to eight agents at the initial scene of the vehicle stop does not indicate a level of intimidation or coercion sufficient to render Defendant's waiver involuntary given that there is no evidence that the agents at the scene "employed any tactics that would augment the degree of coercion that is inherent in any arrest." *United States v. Garcia*, 890 F.2d 355, 360-362 (11th Cir. 1989) (finding that defendant's consent to search was voluntary despite the presence of 14 agents). The uncontroverted evidence here establishes

that, at the initial scene, although SA Bray initially had his firearm drawn, once Defendant was out of the vehicle, his firearm was secured in the holster on his right hip, and he did not recall SA Dorman having his weapon drawn. (Doc. 131 at 17, 27-29, 34.) SA Bray also testified that he did not threaten Defendant or promise him anything, nor was he aware of anyone else making any threats or promises to Defendant. (*Id.* at 13-14). SA James testified that he could not recall if he was wearing his firearm at the police station, or if he had been required to lock it up as some police departments require, but that if it was on him, it was covered and not visible. (*Id.* at 41.) SA James further testified that neither he, nor SA Dorman, threatened Defendant or promised him anything, and they did not force him in any way to answer questions. (*Id.* at 44.); *see also United States v. Kalu*, 485 F. App'x 366, 369 (11th Cir. 2012) (holding that when law enforcement provides uncontroverted testimony of a fact, the evidence is sufficient to show that fact). SA James's testimony is also corroborated by the recording of the police station interview, which shows that, if SA James and SA Dorman were wearing their firearms, the firearms were not drawn or visible, and the agents did not threaten Defendant or make any promises. (Gov't Ex. 1 (video) at 0:54:35–1:24:45.)

Fifth, though it was a windy, rainy day, SA Bray testified that the temperature was "mild," and in any event, the evidence establishes that Defendant was outside only 15-25 minutes prior to being read the *Miranda*

warnings.[6] (Doc. 131 at 15-16, 18-23, 25-27, 37, 46-48, 58-59, 68-69.) The *Miranda* warnings and the roadside interview together lasted only about five minutes, at which time Defendant was moved out of the rain to the police station. (Doc. 131 at 15-16, 18-23, 25-27, 37, 46-48, 58-59; Govt' Ex. 1 (audio).) SA James testified that the reason for transporting Defendant and the other individuals to the police station at that point was to get everyone out of the rain, though several agents stayed at the scene, working with evidence. (Doc. 131 at 49-50, 58.) Once at the police station, the evidence establishes that Defendant waited only about one hour in the interview room prior to SA James and SA Dorman arriving, and their interview with Defendant lasted about 30–35 minutes. (Gov't Ex. 1 (video).)

_____

[6] SA Bray testified that he stood with the vehicle's occupants, including Defendant, in the grassy area for "a brief period of time," which he estimated to be about 15-25 minutes prior to giving Defendant the *Miranda* warnings. (Doc. 131 at 19-21.) Defendant's testimony about the length of time he was at the roadside location was inconsistent. He testified that he was at the roadside location standing in the rain for "a few hours," meaning "more than two hours," (*Id.* at 68, 70); then he testified that he was at the roadside location for "about an hour," before the *Miranda* warnings were read to him, (*Id.* at 69, 71); and then he testified that he was at the roadside location from noon until later in the day, but changed that testimony to state that he was at the roadside location from "daytime" until dark, (*Id.* at 75-76). Defendant also testified that he did not recall where he was when he was interviewed at the roadside location, and then stated that he was standing in the rain. (*Id.* at 76-77.) As discussed further below, the Court finds that Defendant's testimony was not entirely credible, and it credits SA Bray's testimony about the length of time spent at the roadside location. *See Infra*, Section III(D). The Court notes, however, that even if the time at the roadside totaled one to two hours, instead of 30-35 minutes, it does not change the Court's ultimate findings and recommendation about the voluntariness of Defendant's waiver.

Thus, the entire detention lasted about two hours, and the actual questioning of Defendant lasted no more than 40 minutes total—two to five minutes at the roadside, and 30–35 minutes at the police station. (Gov't Ex. 1 (video); Gov't Ex. 1 (audio)). The conditions and length of detention and questioning, therefore, did not produce the type of coercive environment that may render a defendant's waiver involuntary. *See Thompkins*, 560 U.S. at 387 (finding no authority for the proposition that an interrogation that lasted three hours while Defendant sat in a straight-backed chair in a standard-sized room is "inherently coercive"); *Shriner*, 715 F.2d at 1456 (questioning that lasted five hours while defendant was in a small room and remained handcuffed did not render defendant's waiver involuntary); *but compare United States v. Levasseur*, 699 F. Supp. 965, 994 (D. Mass. 1988), rev'd in part on other grounds, 846 F.2d 786 (1st Cir. 1988) (finding that defendant's statement was involuntary given the circumstances that included surrender to a large number of well-armed officers and being made to lay face down on the wet sidewalk in the rain with her hands shackled behind her back).

Finally, there is no evidence that indicates Defendant was subjected to "the use of physical punishment such as the deprivation of food or sleep." *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Defendant asserts that "he was deprived of water for many hours," and despite the lengthy detention, he was "never offered as much as water or any other drink." (Doc. 136 a 47-48.) As discussed, the entire detention lasted only about two hours, and the actual questioning of Defendant lasted no

more than 40 minutes total—two to five minutes at the roadside, and 30–35 minutes at the police station. (Gov't Ex. 1 (video); Gov't Ex. 1 (audio).) But even assuming that the detention lasted an hour or two longer, which the credible evidence does not support and the Court does not find, there is no evidence whatsoever showing that Defendant was "deprived" of water as he asserts. The only evidence of this fact that Defendant cites is SA James's testimony responding to counsel's question: "Did you ask him if he wanted anything to drink?" (Doc. 131 at 53). SA James, speaking only about himself, responded: "I don't recall asking him that." (*Id.*) There is no testimony from Defendant, (*Id.* at 67-77), nor any other testimony or evidence, indicating that Defendant asked for water and was denied, that Defendant was never offered water by someone else, or that Defendant was deprived of water for "many hours."

### D. Defendant's *Miranda* Waiver was Knowing

In addition to establishing that *Miranda* warnings were given, and that Defendant's statement was voluntary, the government must also show by a preponderance of the evidence that Defendant's waiver of his right to remain silent was knowing. *Thompkins*, 560 U.S. at 384. Defendant argues that he was unable to comprehend or understand the rights he was waiving because he was "under the influence of drugs and/or alcohol," on March 7, 2022, and he has a fifth-grade level education. (Doc. 136 at 32-36, 41-44.) According to Defendant, the fact that he was under the influence is shown by his behavior that is seen and heard on the recordings, including that: he made multiple statements indicating that he didn't know "what's going on"; his speech was "notably slurred or

otherwise impaired"; while waiting in the interview room, he was at times "generally erratic and agitated," at other times, he was slouching and leaning on the table for support, and he exhibited "a lack of control over his bodily functions," — *i.e.*, he expressed flatulence; and he offered "confused answers" to the agents' questions. (*Id.* at 20, 34-36, 42-45.) Defendant also asserts that his being under the influence is supported by the following facts: he has a "documented history of drug use"; he has a history of drug-related arrests; pills were found in the vehicle he was in; and he testified under oath that he had no memory of the interview at the police station. (*Id.* at 44-45). Defendant further argues that his low education level, and his "functional" illiteracy, precludes finding that his *Miranda* waiver was knowing. ( *Id* at 41-42).

The evidence refutes Defendant's arguments. SA Bray and SA James both testified that Defendant did not appear to be under the influence of any drugs or alcohol, or otherwise impaired in any way. (Doc. 131 at 13-14, 31-35, 43, 48, 50-53, 57-58). And SA James specifically testified that he did not smell alcohol or marijuana. (*Id.* at 57). Both agents also testified that Defendant appeared to understand all of their questions, which was shown by Defendant's responses and actions. SA Bray testified that, throughout their interaction, Defendant always responded appropriately, (*Id.* at 13-15), and SA James testified that Defendant's responses to all of SA James's questions were timely, coherent, and appropriately addressed the questions. (*Id.* at 43, 48, 50-53, 57-58.) SA James also testified that during the interview, he asked Defendant questions and Defendant responded, and Defendant also asked questions. (*Id.* at 43-44). Defendant, on the

other hand, testified that he remembered going to the police station and sitting in the interview room with Lipscomb, but he did not remember "talking to nobody" at the station, including Lipscomb, SA James and SA Dorman, and he did not remember anything after sitting in the interview room with Lipscomb. (*Id.* at 69, 72-75.)

The Court credits the agents' testimony over that of Defendant. Having personally observed SA Bray, SA James and Defendant at the evidentiary hearing, the Court finds that the agents' testimony, given under oath, was credible, and Defendant's testimony was not entirely credible. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony, and the "choice of whom to believe is conclusive on the [reviewing] court unless the judge credits *exceedingly* improbable testimony") (emphasis in original)). As discussed above, Defendant's testimony was internally inconsistent about several facts. Regarding his detention at the roadside location, he testified that he was at that location standing in the rain for "a few hours," meaning "more than two hours," (Doc. 131 at 68, 70); then he testified that he was at the roadside location for "about an hour," before the *Miranda* warnings were read to him, (*Id.* at 69, 71); and then he testified that he was at the roadside location from noon until later in the day, but changed that testimony to state that he was at the roadside location from "daytime" until dark, (*Id.* at 75-76). Defendant also testified that he did not recall where he was when he was interviewed at the roadside location, but then testified that he was

standing in the rain. (*Id.* at 76-77.) Regarding his detention at the police station, he purportedly remembered going to the police station and sitting with Lipscomb in the interview room, but then he testified that he did not remember "talking to nobody" at the station, including Lipscomb, SA James and SA Dorman. (*Id.* at 69, 72-75.) When asked if he would be surprised to know that the video recording showed him being interviewed for 35 minutes, he stated "Hey, I don't remember. I didn't get [the video]," and he continued to state that he did not remember anything after sitting in the room with Lipscomb. (*Id.* at 72-75). Defendant's ability to remember events of that day prior to sitting in the interview room with Lipscomb, who he stated he did not talk to, but inability to remember *anything* after that was not credible. (*Id.*; Gov't Ex. 1 (video) at 0:00:00–0:53:10) (showing Lipscomb and Defendant together in the interview room, and periodically talking to each other, prior to SA James and SA Dorman beginning Defendant's interview)).

SA Bray's and SA James's testimony, on the other hand, was both internally consistent and consistent with each other. (Doc. 131 at 6-58). Both agents' testimony is also corroborated by the recordings that were admitted into evidence. The recordings show that Defendant responded appropriately to questions, asked questions, and remained engaged with the agents, and they further show that the tone of both interviews was calm, conversational and professional. (Gov't Ex. 1 (audio); Gov't Ex. 1 (video).) The Court does not agree that Defendant's speech on the recordings was "notably slurred," and Defendant's physical behavior while waiting, including slouching on the table,

periodic walking around, and flatulence, does not establish that he was under the influence of drugs or alcohol, nor does it overcome the credible testimony of the agents, who were both in close physical contact with Defendant, and speaking directly with him face-to-face, on March 7, 2022. (*Id.*)

Further, a defendant may knowingly and intelligently waive *Miranda* rights despite a lack of education, an inability to speak English, or a mental disability, and the evidence establishes that Defendant did so here. *Barbour*, 70 F.3d at 585 (holding that a defendant's mental disability does not, on its own, render a waiver involuntary); *Beale*, 921 F.2d at 1435 (explaining that a defendant is capable of knowingly and intelligently waiving *Miranda* rights, despite a lack of education or an inability to speak English); *United States v. White*, 451 F.2d 696, 700-701 (5th Cir. 1971) (holding that *Miranda* waiver was valid despite defendant's "below average I.Q., fifth grade education, [and] poor reading ability"). As discussed, both agents credibly testified, and the recordings corroborate, that Defendant appeared to understand all of their questions, he responded appropriately, and he also asked questions. (Doc. 131 at 13-15, 43, 48, 50-53, 57-58.) Also, as shown in the recordings, prior to the interviews, both SA Bray and SA James stated that Defendant did not have to talk to them, and could stop questioning at any time. (Gov't Ex. 1 (audio) at 01:00–02:16; Gov't Ex. 1 (video) at 0:54:35–0:56:55); *see Coleman v. Singletary*, 30 F.3d 1420, 1426 (11th Cir. 1994) (finding voluntary and knowing waiver of rights, in part due to the fact that defendant's "interrogators made it clear to him that he could end their discussion at any time"). Having reviewed the recordings, the Court finds that

Defendant's statements about not understanding "what's going on" are about his generally not understanding why he was being arrested and included with the others, and are not an indication that he did not understand the agents' direct statements and questions to him during the *Miranda* warnings about his right to remain silent, his right to counsel, and his right to stop questioning. (Gov't Ex. 1 (audio) at 1:00–2:16; Gov't Ex. 1 (video) at 0:54:35–056:55.) And indeed, there is no testimony from Defendant, (Doc. 131 at 67-77), nor any other testimony or evidence, indicating that Defendant did not understand his right to remain silent, which he told agents he did understand. (Doc. 131; Gov't Ex. 1 (audio) 01:00–02:16; Gov't Ex. 1 (video) at 0:54:35–0:56:55.)

Defendant's prior experience with the criminal justice system—he asserts that he has a history of prior arrests, and at least one prior conviction, (Doc. 136 at 44-45)—also supports finding that his present waiver of rights was knowing. *Henyard v. McDonough*, 459 F.3d 1217, 1241 (11th Cir. 2006) (citing defendant's "previous experience with the justice system" as one of the circumstances in the totality of circumstances indicating that defendant's confession was voluntary and knowing).

"[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." *Davis v. United States*, 512 U.S. 452, 460 (1994). "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433, n.20 (1984). Here, the totality of the

evidence establishes by a preponderance that: Defendant made a voluntary and knowing *Miranda* waiver; Defendant did not "unambiguously" invoke his right to remain silent; and the agents "adhered to the dictates of *Miranda*," at all times. Accordingly, Defendant's statements should be ruled admissible.

## IV.   CONCLUSION

For the above reasons, the Court **RECOMMENDS** that Defendant's motion to suppress statements, (Doc. 120), be **DENIED**.

Defendant has no further motions pending before me. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO RECOMMENDED** June 15, 2023.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE